**Shannon Armstrong**, OSB No. 060113
Shannon.Armstrong@hklaw.com
**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR 97204
Telephone: 503.243.2300
Fax: 503.241.8014

Attorneys For Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| PIONEER NURSING HOME HEALTH DISTRICT, an Oregon nonprofit corporation, ) ) | Case No. |
| Plaintiff, ) ) | **COMPLAINT FOR REFUND** |
| v. ) ) | **DEMAND FOR JURY TRIAL** |
| THE UNITED STATES OF AMERICA, ) ) | |
| Defendant. ) ) | |

Plaintiff Pioneer Nursing Home Health District ("Plaintiff"), brings this action against defendant United States of America ("Defendant"), acting by and through the Internal Revenue Service ("IRS"), for a refund of Employee Retention Credits totaling $491,799.00, plus interest and additional amounts as provided by law, pursuant to Internal Revenue Code ("I.R.C.") § 7422. To the extent applicable, Plaintiff seeks reasonable litigation and administrative costs as permitted by I.R.C. § 7430. In support thereof, Plaintiff alleges:

///

///

Page 1 -    COMPLAINT

## PARTIES

1.

Plaintiff is in the business of providing assisted living and continuing care facilities for individuals.

2.

Plaintiff is an Oregon domestic nonprofit corporation with a principal place of business located at 1060 D Street West, Vale, Oregon 97918.

3.

Defendant is the United States of America.

## JURISDICTION AND VENUE

4.

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(1).

5.

Venue in this Court is proper under 28 U.S.C. § 1402.

6.

Plaintiff brings this action under I.R.C. § 7422 to recover refunds of overpaid federal employment taxes, plus interest, for the tax quarters ending June 30, 2020 ("Q2 2020"), September 30, 2020 ("Q3 2020"), December 31, 2020 ("Q4 2020"), and September 30, 2021 ("Q3 2021") (collectively, "quarters at issue").

7.

On or about March 27, 2023, Plaintiff mailed Form 941-X for Q2 2020, Q3 2020, Q4 2020, and Q4 2021 seeking employment tax refunds from the IRS attributable to the Employee Retention Credit ("initial ERC Refund Claims").

8.

The amounts of the initial ERC Refund Claims were as follows:

    a.  Q2 2020: $208,579.54

Page 2 -    COMPLAINT

HOLLAND & KNIGHT LLP
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone:  503.243.2300

b.  Q3 2020: $ 55,252.75

c.  Q4 2020: $ 12,939.82

d.  Q3 2021: $268,423.51

9.

In July of 2023, the IRS allowed Plaintiff's initial ERC claims for Q2 2020, Q3 2020 and Q4 2020, and subsequently issued refund checks to Plaintiff for the amounts claimed (as stated in paragraph 8 a. through d.).

10.

In March of 2024, the IRS reversed the approval of the ERC refunds for Q2 2020, Q3 2020, and Q4 2020, and notified Plaintiff that it had assessed employment taxes in the amounts of the previously allowed initial ERC Refund Claims (as stated in paragraph 8 a. through d.).

11.

On or about April 11, 2025, Plaintiff filed Forms 843 with the IRS submitting the full payment of the assessed ERC attributable to one employee for Q2 2020, Q3 2020, and Q4 2020. At the same time, Plaintiff claimed refunds in the same amount of the employment taxes that it paid. The amounts of Plaintiff's April 11, 2025, ERC refund claims were as follows:

a.  Q2 2020: $   494.77

b.  Q3 2020: $1,023.49

c.  Q4 2020: $3,481.74

12.

On or about June 16, 2025, the IRS allowed Plaintiff's ERC claim for the second quarter of 2021 ("Q2 2021") and determined an employment tax overpayment for that quarter in the amount of $261,494.76. However, the IRS did not issue a refund check to Plaintiff for Q2 2021 in connection with that overpayment. Rather, the IRS applied a portion of the Q2 2021 overpayment to Q2 2020 fully satisfying the assessment described in paragraph 10 for that quarter, and the IRS applied $10,290.72 of the overpayment to the employment tax assessment for Q3 2020.

Page 3 -     COMPLAINT

13.

On or about July 15, 2025, Plaintiff filed claims for refunds seeking recovery of the payments it made towards the ERC assessments for Q2 2020 and Q3 2020 by virtue of the IRS's application of the Q2 2021 overpayments towards those quarters.

14.

Plaintiff's ERC refund claims sought herein are as follows:

a. Q2 2020: $208,579.54, which is the full amount of its initial ERC Refund Claim for that quarter because Plaintiff has fully paid the entire assessment for that quarter.

b. Q3 2020: $11,314.21, which is the sum of Plaintiff's April 11, 2025, claim for refund for a divisible portion of the ERC credit in the amount of $1,023.49 plus the IRS's application of $10,290.72 of the Q2 2021 overpayment to this quarter.

c. Q4 2020: $3,481.74 which is the sum of Plaintiff's April 11, 2025, claim for refund for a divisible portion of the ERC credit in that amount.

d. Q3 2021: $268,423.51, which is the amount of Plaintiff's initial ERC Refund Claim for this quarter.

15.

With respect to Q3 2020 and Q4 2020, Plaintiff herein seeks refunds of employment taxes that are divisible within the meaning of governing federal law, and, prior to filing this action, Plaintiff fully paid a divisible portion of the tax assessment at issue and timely filed claims for refund with the Internal Revenue Service pursuant to 26 U.S.C. § 7422(a). *See* Treas. Reg. § 31.3111-6 (allegedly erroneous ERC credits are treated as underpayments of employment taxes); 26 U.S.C. 6331(i)(2) ("divisible taxes" include any tax imposed by Subtitle C of the Internal Revenue Code, which encompasses employment taxes); *Boynton v. United States*, 566 F.2d 50, 52 (9th Cir. 1977) (citing *Steele v. United States*, 280 F.2d 89 (8th Cir. 1960)); *Korobkin v. United States*, 988 F.2d 975, 976 (9th Cir. 1993).

Page 4 -    COMPLAINT

16.

With respect to Q2 2020, Q3 2020, and Q4 2020, this action is proper under I.R.C. § 6532(a)(1), as more than six months have passed since Plaintiff filed its ERC Refund Claims with the IRS.

17.

With respect to Q3 2021, this action is proper because it is filed within two years of the IRS's claim-disallowance letter dated August 16, 2024.

18.

The IRS has not paid Plaintiff's ERC Refund Claims at issue herein.

**NATURE OF ACTION**

19.

Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney's fees), authorized to be paid to the Plaintiff under § 2301 of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) (as amended by § 207 of the Taxpayer Certainty and Disaster Relief Act of 2020 ("Relief Act"), Pub. L. No. 116-260, 134 Stat. 1182, 3061 (Dec. 27, 2020)), and I.R.C. § 3134.[1]

**BACKGROUND**

A.    **The Employee Retention Credit**

20.

Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in Government orders addressing the pandemic that disrupted the United States' local and national economies.

---

[1] For ease of reference, references to the CARES Act and to I.R.C. § 3134 are to the versions of the statutes in effect during the quarter at issue.

Page 5 -    COMPLAINT

HOLLAND & KNIGHT LLP
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone:  503.243.2300

21.

Those orders formed a latticework of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID-19.

22.

The governmental response to that public health emergency involved historically unprecedented measures, including lockdown orders, social distancing mandates, and forced business closures.

23.

The economic effects of those policies were profound and the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion. *See* Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion*, THE HARVARD GAZETTE, Nov. 10, 2020, https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16 trillion/.

24.

In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the ERC.

25.

The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the unprecedented challenges posed by the pandemic.

26.

Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy.

Page 6 -    COMPLAINT

HOLLAND & KNIGHT LLP
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone: 503.243.2300

27.

The credit is generally available to eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

**B.     Threshold Requirement: Carrying on a Trade or Business**

28.

An employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue.  *See* CARES Act § 2301(c)(2); I.R.C. § 3134(c)(2).

**C.     Suspension of Business Operations**

29.

An employer is eligible for the ERC if the employer's "operation of the trade or business . . . is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)." I.R.C. § 3134(c)(2)(A)(ii)(I).

30.

The CARES Act does not require that a government order directly regulate the partially suspended business.  *See generally* I.R.C. § 3134.  The language in CARES Act § 2301(c)(2)(A)(ii)(I)  and  I.R.C. § 3134(c)(2)(A)(ii)(I)  contemplates businesses that were constructively suspended through the widespread effects of lockdown orders and similar mandates.

31.

Guidance published in the Internal Revenue Bulletin provides a safe harbor that a business is partially suspended if "more than a nominal portion of its business operations are suspended by a governmental order." *Guidance on the Employee Retention Credit under Section 2301 of the*

Page 7 -     COMPLAINT

**HOLLAND & KNIGHT LLP**
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone:  503.243.2300

*Coronavirus Aid, Relief, and Economic Security Act*, Notice 2021-20, 2021-11 I.R.B. 922, 928 ("Notice 2021-20").[2]

## D.    <u>Qualified Wages</u>

32.

Under § 2301(a) of the CARES Act and I.R.C. § 3134(a), an "eligible employer" is "allowed a credit against applicable employment taxes for each calendar quarter equal to" a percentage of the "qualified wages" paid with "respect to each employee of such employer for such calendar quarter[s]."

33.

Under § 2301(c)(3) and (c)(5) of the CARES Act and I.R.C. § 3134(c)(3) and (c)(4), "qualified wages" include "wages" as defined by I.R.C. § 3121(a) and certain "health plan expenses."

34.

For 2020, eligible employers are allowed a credit against applicable employment taxes for each calendar quarter that is equal to 50 percent of qualified wages paid with respect to each employee of such an employer for such calendar quarter. Under § 2301(b) of the CARES Act, the maximum amount of qualified wages per employee an employer may take into account for all calendar quarters in 2020 is $10,000. In other words, the maximum credit amount an employer may claim per employee for all qualifying quarters in 2020 is $5,000.

35.

For 2021, eligible employers are allowed a credit against applicable employment taxes for each calendar quarter that is equal to 70 percent of qualified wages paid with respect to each

---

[2] If Notice 2021-20 restricts ERC eligibility, it is not controlling law because the notice was not promulgated through the notice-and-comment procedures prescribed in the Administrative Procedures Act, 5 U.S.C. § 553 and, further, parties may always assail an administrative pronouncement as exceeding the agency's statutory authority in proceedings against them. *See NLRB Union v. Fed. Lab. Rels. Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987).

**HOLLAND & KNIGHT LLP**
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone:  503.243.2300

employee of such an employer for such calendar quarter. Under § 2301(b) of the CARES Act, as amended by § 207 of the Relief Act, and I.R.C. § 3134(b), the maximum amount of qualified wages per employee an employer may take into account for any calendar quarter in 2021 is $10,000. In other words, the maximum credit amount an employer may claim per employee for each calendar quarter in 2021 is $7,000.

36.

"Qualified wages" do not include payroll costs used for loans under the "Paycheck Protection Program" of the CARES Act ("PPP loan") that were "forgiven." *See* I.R.C. § 3134(h)(2).

37.

In 2019, the average number of full-time employees Plaintiff employed was 100 or fewer.

## STATEMENT OF FACTS

**A.    Plaintiff's Business Operations Prior to COVID-19 Government Orders**

38.

During the relevant period of time, Plaintiff operated in Vale, Oregon, and served the surrounding area. Plaintiff was a Centers for Medicare & Medicaid Services ("CMS")-certified skilled nursing facility ("SNF") and assisted living facility.

39.

Plaintiff offered skilled nursing, long-term care, and assisted living services as well as physical, occupational, and speech therapy for its residents and outpatients.

40.

Plaintiff's skilled nursing operations involved assisting individuals discharged from the hospital after a significant medical event (e.g., stroke, surgery, heart or respiratory events) who needed additional assistance in recovery that they could not receive at home. Plaintiff's skilled nursing operations accepted individuals on a short-term basis to help them recover. Plaintiff's skilled nursing patients were covered by Medicare.

Page 9 -    COMPLAINT

41.

Plaintiff's long-term care operations provided care to residents who needed ongoing, continual medical care (e.g., 24-hour supervision, nursing care, provided meals, and assistance with everyday activities). Generally, these residents pay out of pocket, as Medicare does not cover long-term care. In some instances, Medicaid covered some of the costs. Payments from Medicare made up more than a nominal portion of Plaintiff's revenue during the relevant periods.

42.

Plaintiff's assisted living operations provided care to individuals who needed daily assistance but were by-and-large able to perform many of their everyday activities.

43.

Plaintiff's physical therapy operations assisted individuals in regaining mobility after a serious medical incident such as injury or illness.

44.

Plaintiff's occupational therapy operations assisted individuals in regaining motor skill and dexterity to allow them to live entirely independently or more independently than before treatment.

45.

Plaintiff's speech therapy operations assisted individuals with a variety of communication difficulties to allow them to live entirely independently or more independently than before treatment.

46.

Plaintiff's nursing home facility had approximately 33 beds, and its assisted living facility had approximately 31 beds.

47.

Plaintiff's employees served a number of unique roles, including managers, office staff, an activities director, nurses, medical technicians, certified nursing assistants, housekeepers, laundry aids, dietary aids, and cooks.

HOLLAND & KNIGHT LLP
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone: 503.243.2300

48.

Prior to COVID-19, Plaintiff provided medical, mental and emotional, and support care to its residents. Providing those services required close contact between Plaintiff's employees and its residents.

49.

In operations prior to COVID-19, most of Plaintiff's procedures and care did not require use of masks or face coverings, and very few procedures required use of personal protective equipment ("PPE") beyond gloves.

50.

In operations prior to COVID-19, facilitating personal interactions among Plaintiff's residents and outside visitors was an important aspect of Plaintiff's services to its residents as such interactions supported residents' mental and social well-being. In pre-COVID 19 operations, such socialization and visitation were encouraged and largely unrestricted.

51.

In operations prior to COVID-19, Plaintiff provided social and emotional support to residents by organizing communal dining and scheduled, organized group activities.

**B.** **Relevant Government Orders**

52.

In March 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. Afterward, federal, state, and local governments in the United States issued public health orders to mitigate the spread of the virus.

53.

During the quarters at issue, Plaintiff's operations were subject to orders issued by various federal, state, and local authorities, including executive orders issued by the governor of Oregon, orders and guidance issued by Oregon Department of Human Services ("OR DHS") and Oregon Housing Authority ("OHA") under those executive orders, Oregon OSHA workplace-safety

Page 11 -    COMPLAINT

orders, and federal directives and guidance issued by CMS, CDC, and federal OSHA that were incorporated into, required by, or enforced through the applicable state and federal regulatory framework.

54.

The Government orders that impacted Plaintiff's business operations included, but were not limited to, representative orders imposing the following categories of restrictions: admission and readmission restrictions; social-distancing and contact-reducing restrictions, including restrictions on communal dining, group activities, community outings, and visitation; PPE and source-control restrictions; screening, monitoring, documentation, and contact-tracing restrictions; testing requirements for residents, staff, and associated personnel; work-exclusion and staffing restrictions; and staff-training and COVID-19 administrative requirements.

55.

Government orders issued in response to the COVID-19 pandemic prevented, restricted, or substantially limited conduct of Plaintiff's activities.

56.

Specifically, the government orders that impacted Plaintiff's business operations included, but were not limited to, the following:

1. **State and Local Orders**

   a.    *Oregon Executive Orders*

57.

On March 8, 2020, the governor of Oregon ("Governor") issued Oregon Executive Order No. 20-03 declaring a state of emergency under ORS 401.165 *et seq.* due to the public health threat posed by COVID-19.

58.

Oregon Executive Order No. 20-03 directed OHA and the state Public Health Director to take actions necessary and authorized to respond to, control, mitigate, and recover from the

Page 12 -    COMPLAINT

emergency, and it directed state agencies to develop and implement procedures consistent with public-health recommendations to prevent or alleviate the public-health threat.

59.

The Governor extended Executive Order No. 20-03 through a series of additional executive orders, including Executive Orders 20-24, 20-30, 20-38, 20-59, 20-67, 21-15, and 21-36, and the state of emergency remained in effect through at least December 21, 2021.

60.

Executive Order No. 20-03 directed that state agencies were to develop and implement procedures designed to prevent or alleviate the public health threat, and that state agencies shall develop and implement procedures, including waiving rules or adopting temporary rules within the agency's authority, consistent with guidance from the state Public Health Director, designed to prevent or alleviate the public health threat.

61.

Executive Order No. 20-03 declared the state of emergency that activated all subsequent restrictive orders, specifically authorized guidelines for private business work restrictions, empowered agencies to adopt the temporary rules that directly curtailed Plaintiff's operations and triggered expanded sick-leave rights that contributed to staffing disruptions.

62.

On March 19, 2020, the Governor issued Executive Order No. 20-10 (effective through April 27, 2020), ordering the cancellation or rescheduling of all elective and non-urgent procedures across all health care settings that utilized PPE, for the purpose of conserving and redirecting PPE for the state's COVID-19 emergency response. This order reduced admissions to Plaintiff's skilled nursing facility of Medicare patients for rehabilitation purposes.

63.

On March 23, 2020, the Governor issued Executive Order No. 20-12 (effective through May 14, 2020), ordering Oregonians to stay at home to the greatest extent possible, prohibiting

Page 13 -    COMPLAINT

non-essential social and recreational gatherings if six-foot distancing could not be maintained, requiring all businesses to facilitate telework to the maximum extent possible, requiring businesses to designate an employee to establish, implement, and enforce social distancing policies, and providing that businesses failing to comply would be closed. This order required and caused Plaintiff's management to devote hours of education and research to determine the course of Plaintiff's operations, spend time learning CMS telehealth guidelines, and draft and implement Plaintiff's telehealth policies and procedures.

64.

On April 27, 2020, the Governor issued Executive Order No. 20-22 (effective through June 25, 2021), providing that elective and non-urgent procedures across all care settings utilizing PPE shall not occur unless they comply with guidance or administrative rules issued by OHA. This order continued to reduce admissions to Plaintiff's skilled nursing facility of Medicare patients for rehabilitation purposes.

65.

On May 14, 2020, the Governor issued Executive Order No. 20-25 (effective through June 5, 2020), establishing baseline statewide protective requirements and a phased reopening process, requiring compliance with OHA guidance including sector-specific long-term care facility guidance, and making guidance issued by OHA enforceable as public-health law. Malheur County was in Phase 1 from approximately May 15, 2020, through June 6, 2020.

66.

On June 5, 2020, the Governor issued Executive Order No. 20-27 (effective through December 3, 2020), replacing Executive Order 20-25, continuing baseline statewide requirements and the phased reopening process requiring that individuals maintain physical distancing of at least six feet from any person who is not a member of their household, businesses implement telework and work-at-home by employees to the maximum extent possible, and that businesses implement physical distancing policies consistent with OHA guidance. Malheur County was in Phase 2 from

Page 14 -  COMPLAINT

approximately June 6, 2020, through August 6, 2020, then regressed to Phase 1 from approximately August 13, 2020, through November 11, 2020.

67.

On November 18, 2020, the Governor issued Executive Order No. 20-65 (effective through December 3, 2020), imposing a temporary "freeze" to control surging COVID-19 cases, with business and sector-specific restrictions and requiring all businesses to facilitate telework to the maximum extent possible. Malheur County was under the freeze from approximately November 18, 2020, through December 3, 2020.

68.

On December 3, 2020, the Governor issued Executive Order No. 20-66 (effective through June 25, 2021), delegating to OHA authority to issue binding public, employer, and sector guidance, directing individuals and businesses to comply with applicable OHA guidance, imposing a Risk Level framework, and providing that businesses and entities failing to comply could be closed until they demonstrated compliance. Malheur County was at the Extreme Risk Level from at least November 15, 2020, through December 31, 2020.

b.    *Oregon Department of Human Services ("OR DHS") Orders*

69.

On March 10, 2020, OR DHS issued Executive Letter Ref. NF-20-67 (effective through at least March 26, 2021), requiring all nursing facilities, residential care facilities, and assisted living facilities to restrict visitation of non-essential individuals, screen 100% of essential individuals prior to entry, document all screenings, limit visitation of essential visitors, discontinue community outings, further restrict visitation when suspected or confirmed COVID-19 was present, provide virtual visit solutions, and required Plaintiff to implement CMS guidance in its facility.

70.

On March 18, 2020, OR DHS issued NF-20-70, the COVID-19 Implementation Guide (effective through at least March 26, 2021), requiring every individual entering Plaintiff's facility

Page 15 -     COMPLAINT

to be screened each time they entered, requiring all screenings to be documented and logged, restricting visitor access to the resident's room or designated visitation room, requiring visitors to use appropriate protective equipment and limit direct physical contact, discontinuing all community outings and activities requiring outside vendors, discouraging congregate activities, and requiring facilities to follow further OR DHS restrictions on admissions, visitation, and infection control when suspected or confirmed COVID-19 was identified.

71.

On March 30, 2020, OR DHS issued a letter regarding COVID-19 reporting requirements (effective through at least September 30, 2021), reiterating requirements for facilities and stating that "[t]he Executive Order restricts the admission or readmission of residents without prior written approval of Safety, Oversight and Quality Unit." Thus, Plaintiff was required to obtain prior written approval before admitting or readmitting residents during periods in which Executive Order were in effect.

72.

On June 3, 2020, OR DHS issued NF-20-89, Phase One Re-Opening Guidance (effective for Malheur County at least August 13, 2020, through November 11, 2020), requiring screening of residents who returned to the facility, risk-based interviews regarding community activities, 14-day enhanced monitoring when residents engaged in activities posing significant COVID-19 exposure risk, and continuing restrictions on non-essential visitors.

73.

On July 13, 2020, OR DHS issued NF-20-98, Limited Outdoor Visitation, which permitted only limited, structured outdoor visits subject to screening, hand hygiene, masks, visitor logs for contact tracing, appointment times, physical distancing of at least six feet, limit of two visitors per resident, prohibition on food during visits, and facility staff monitoring of all visits. Facilities under a OR DHS Executive Order due to confirmed COVID-19 were prohibited from allowing visitation. Beginning in July 2020, OR DHS issued temporary administrative orders establishing COVID-19

Page 16 -    COMPLAINT

HOLLAND & KNIGHT LLP
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone: 503.243.2300

testing requirements for nursing facilities, assisted living facilities, and residential care facilities: APD 29-2020 (effective July 15 through August 10, 2020), APD 34-2020 (effective August 10 through November 1, 2020), and APD 45-2020 (effective November 1, 2020, through January 6, 2021). These orders required facilities to implement quarantine measures for newly admitted or readmitted residents for 14 days, conduct risk-based COVID-19 screenings prior to admission or readmission, and comply with initial testing, outbreak-prevention testing, associated-staff testing, consent, reporting, and reimbursement requirements.

74.

On November 2, 2020, OR DHS issued NF-20-140, Limited COVID-19 Indoor Visitation Policy (effective through approximately November 18, 2020), establishing core principles of infection prevention for visitors, permitting indoor visitation only when there had been no new COVID-19 cases in the last 14 days and the facility was not under an OR DHS Executive Order, and requiring screening, masking, hand hygiene, and limiting visitors.

75.

On November 15, 2020, OR DHS issued NF-20-149 (effective November 18, 2020, through at least January 29, 2021), prohibiting all indoor visitation for long-term care facilities statewide and severely limiting outdoor visitation to no more than six people at a time from no more than two households.

76.

On December 1, 2020, OHA and DHS issued guidance 3464, Best Practices for Hospitals and Long-term Care Facilities for COVID-19 related New/Readmissions (effective through at least December 31, 2020), providing that OR DHS would not approve transfer of COVID-19 patients requiring transmission-based precautions to COVID-negative LTCFs ("Long Term Care Facilities"), thereby restricting admissions and transfers to Plaintiff's facilities.

Page 17 -    COMPLAINT

77.

On January 6, 2021, OR DHS issued Permanent Administrative Order APD 54-2020 (effective January 6, 2021, and remaining current through the quarters at issue), requiring 14-day quarantine measures for newly admitted or readmitted residents, risk-based COVID-19 screenings prior to admission or readmission, prohibition on admitting residents presenting COVID symptoms without prior testing, written OR DHS approval before admitting residents known to have COVID-19, and requiring facilities to follow OHA COVID-19 clinical guidelines.

c.    *Oregon Health Authority ("OHA") Orders*

78.

On March 9, 2020, OHA issued Provisional Guidance: Clinical Care and Healthcare Infection Prevention and Control for COVID-19 (effective through March 27, 2020), requiring healthcare settings to exclude sick or exposed healthcare personnel from the workplace for a minimum number of days, restrict access to the facility by visitors, and dedicate medical equipment to sick or suspected COVID-19 patients.

79.

On March 22, 2020, OHA issued the LTCF COVID-19 Response Toolkit (effective through at least December 31, 2020, supplemented by the July 2020 COVID-19 Readiness Assessment Tool Update), urging all LTCFs to take aggressive actions immediately to reduce the risk of COVID-19 infections, and providing resources for COVID-19 response planning including elements for visitor restrictions, education/monitoring/screening of employees and residents, PPE availability, infection prevention and control practices, and communication.

80.

On March 27, 2020, OHA issued updated Provisional Guidance 2288J: Clinical Care and Healthcare Infection Prevention and Control of COVID-19 (updated May 9, 2020, and July 22, 2020; effective through July 9, 2021), requiring exclusion of sick or exposed healthcare personnel from the workplace, management of PPE supplies and usage, bundling patient care to increase

Page 18 -    COMPLAINT

efficiency and reduce exposure time, universal masking by patients, visitors, and healthcare personnel, and universal eye protection for healthcare personnel. Plaintiff experienced unanticipated staffing gaps due to these mandates: 74 days in Q2 2020, 266 days in Q3 2020, 137 days in Q4 2020, and 82 days in Q3 2021. These mandates also restricted movement by employees within Plaintiff's facility, increasing the time required to complete tasks compared to pre-COVID-19 operations.

81.

On April 30, 2020, OHA issued Guidance 2322U on Resumption of Non-Emergent and Elective Procedures (updated July 30, 2020; effective through at least December 31, 2020), requiring hospitals to "consider ongoing postponement of non-emergent and elective procedures that are expected to require . . . [t]ransfer to skilled nursing facility or inpatient rehabilitation," which continued to reduce admissions to Plaintiff's skilled nursing facility.

82.

On June 12, 2020, OHA issued the Long Term Care Facility Testing Plan, requiring facilities to complete baseline testing of staff and residents by September 30, 2020, and to develop and implement a plan for ongoing monitoring including mandatory testing of all staff every 7 days so that 100% were tested every month.

d.    *Oregon Occupational Safety and Health Division ("OSHA") Orders*

83.

On November 6, 2020, Oregon OSHA issued Temporary Administrative Order OSHA 3-2020 (effective November 16, 2020 through May 5, 2021; text corrections December 11, 2020), requiring all employers to ensure work activities were designed to eliminate the need for employees to be within six feet of another, requiring all individuals at the workplace to wear masks or face coverings, requiring regular cleaning and sanitization of common areas, and imposing additional requirements on healthcare employers including measures to protect employees from

Page 19 -    COMPLAINT

infected individuals, use of airborne infection isolation rooms, isolation of suspected patients, and use of physical barriers.

84.

On June 30, 2021, Oregon OSHA issued Temporary Administrative Order OSHA 5-2021 (effective through September 16, 2021; amended August 2021 to reimplement employee masking requirements), requiring employers to regularly clean and sanitize common areas, shared equipment, and high-touch surfaces, and requiring employees recommended for quarantine or isolation by OHA or a medical provider to isolate at home. Healthcare employers were required to implement appropriate sanitation measures and develop cleaning and disinfection procedures.

85.

On September 16, 2021, Oregon OSHA issued Temporary Administrative Order OSHA 12-2021 (effective through at least September 30, 2021), continuing the cleaning and sanitization requirements, employee quarantine and isolation provisions, healthcare-specific sanitation measures, physical distancing requirements of six feet, and screening and triage requirements.

**2. Federal Orders**

a. *Centers for Medicare & Medicaid Services ("CMS") Orders*

86.

On March 13, 2020, CMS issued QSO-20-14-NH, Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (updated September 28, 2020 and March 10, 2021; effective through May 11, 2023). QSO-20-14-NH required nursing facilities to restrict visitation of all visitors and non-essential healthcare personnel except for compassionate care situations, cancel communal dining and all group activities (internal and external), implement active screening of residents and staff for fever and respiratory symptoms, screen all staff at the beginning of each shift, identify and restrict staff who worked at multiple facilities, and revise facility interactions with vendors, EMS personnel, transportation providers,

Page 20 -    COMPLAINT

and other non-healthcare providers. OR DHS specifically required Plaintiff to implement this CMS-issued guidance.

87.

On August 26, 2020, CMS issued QSO-20-38-NH (IFC), CMS-3401-IFC (revised April 27, 2021; effective through May 11, 2023), establishing long-term care facility testing requirements for residents and staff based on parameters and frequency set by the HHS Secretary, requiring staff with symptoms to be tested and restricted from the facility pending results, requiring residents with symptoms to be tested and placed on transmission-based precautions, and requiring that upon identification of a single new COVID-19 case all staff and residents be tested and retested every 3 to 7 days until no new cases were identified for at least 14 days.

88.

On September 17, 2020, CMS issued QSO-20-39-NH, Nursing Home Visitation – COVID-19 (revised March 10, 2021 and April 27, 2021; effective through May 11, 2023), establishing core principles of COVID-19 infection prevention for visitors including screening of all who enter the facility, hand hygiene, face coverings, social distancing of at least six feet, cleaning and disinfecting high-touch surfaces and designated visitation areas after each visit, appropriate staff use of PPE, effective cohorting of residents, and resident and staff testing. Indoor visitation was permitted only when there had been no new COVID-19 cases in the last 14 days and the facility was not conducting outbreak testing.

89.

On May 11, 2021, CMS issued QSO-21-19-NH, Interim Final Rule – COVID-19 Vaccine Immunization Requirements for Residents and Staff (effective through November 5, 2021), requiring each facility to develop and implement policies and procedures to offer COVID-19 vaccination to all residents and staff that elected them, and to administer vaccines in accordance with CDC, ACIP, FDA, and manufacturer guidelines.

Page 21 -    COMPLAINT

b.    *Centers for Disease Control and Prevention ("CDC") Orders*

90.

The CDC issued Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic (effective February 21, 2020 through at least September 30, 2021), requiring implementing telehealth protocols to minimize risk of COVID-19, screening everyone entering a healthcare facility for COVID-19 symptoms (including limiting and monitoring points of entry and immediately isolating potentially infected patients), daily active monitoring of all admitted patients, implementing six-foot physical distancing measures (including limiting visitors and altering physical space), dedicating entire areas and personnel for treating COVID-19 patients, and enforcing PPE use with specific procedures for donning and doffing after each treatment.

91.

The CDC also issued Interim U.S. Guidance for Risk Assessment and Work Restrictions for Healthcare Personnel with Potential Exposure to COVID-19 (effective through at least September 30, 2021), providing that asymptomatic employees were to be excluded from the workplace for 14 days after certain exposures if they were not complying with PPE requirements at the time of exposure, and outlining symptom-based and test-based strategies for determining when sick healthcare workers could return to work.

92.

Plaintiff was required to follow CDC requirements and guidance to the extent they were incorporated into, required by, or enforceable through the federal and state orders described above (including through OR DHS's NF-20-67, which required compliance with CMS guidance that in turn referenced CDC protocols), OHA's 2288J guidance (which directed healthcare facilities to CDC's Interim Infection Prevention and Control Recommendations), and CMS's QSO-20-38-NH (which required compliance with CDC testing and return-to-work guidelines).

Page 22 -    COMPLAINT

**C.      Plaintiff's Business Operations Were Partially Suspended Due To—And As a Direct and Foreseeable Consequence of—Government Orders**

93.

Throughout the quarters at issue, Plaintiff complied with the orders listed above ("Government Orders") and implemented the requirements imposed by those orders.

94.

Implementing those requirements caused identifiable portions of Plaintiff's business operations to stop temporarily or become inoperative.

95.

The Government Orders were both the but-for cause and the proximate cause of the partial suspension of Plaintiff's business operations during each of the quarters at issue. But for the specific mandates, prohibitions, and requirements imposed by those orders, Plaintiff would not have ceased or curtailed the identified portions of its operations.

96.

Furthermore, each identified suspension was the direct and foreseeable consequence of the specific order that mandated, prohibited, or restricted the affected activity, and not the product of general pandemic conditions, voluntary business decisions, or attenuated causal chains.

97.

By way of example, the following operational suspensions were directly mandated by specific Government Orders and would not have occurred absent those orders:

a.    *Visitation Suspension.* OR DHS's Executive Letter NF-20-67 (as updated March 18, 2020) expressly prohibited non-essential visitation and OR DHS's NF-20-149 (November 18, 2020) expressly prohibited all indoor visitation statewide. These orders directly commanded Plaintiff to cease providing in-person visitation services, which is a core component of its resident care, and Plaintiff would not have ceased those services but for those mandatory prohibitions. The

Page 23 -      COMPLAINT

cessation of visitation was the direct and foreseeable consequence of orders that expressly stated "restrict visitation of non-essential individuals" and "all indoor visitation is prohibited."

b. *Communal Dining and Group Activities Suspension.* CMS's QSO-20-14-NH expressly commanded nursing facilities to "[c]ancel communal dining and all group activities, such as internal and external group activities." OR DHS required Plaintiff to implement this CMS directive. But for this order, Plaintiff would have continued to provide communal dining and group activities to its residents. The cessation of communal dining and activities was the direct and intended consequence of the order's express prohibition.

c. *Community Outings Suspension.* OR DHS's NF-20-70 Implementation Guide commanded: "Effective immediately, all community outings shall be discontinued, along with any activities that require outside vendors to enter the facility." But for this order, Plaintiff would have continued its community outing program.

d. *Admission Restrictions.* Executive Order No. 20-10 ordered postponement of elective and non-urgent procedures across all healthcare settings utilizing PPE. OHA's implementing guidance required hospitals to "consider ongoing postponement of non-emergent and elective procedures that are expected to require . . . [t]ransfer to skilled nursing facility or inpatient rehabilitation." These orders directly and foreseeably reduced the flow of Medicare rehabilitation patients to Plaintiff's skilled nursing facility, which is the very result the orders were designed to accomplish, by stopping the upstream procedures that generated those admissions. But for these orders, hospitals would have continued performing elective procedures and transferring rehabilitation patients to Plaintiff.

e. *Staffing Suspensions.* Government Orders expressly required Plaintiff to exclude sick or exposed healthcare personnel from the workplace. CMS's QSO-20-14-NH stated: "If they are ill, have them put on a facemask and self-isolate at home." OR DHS's implementing directives required the same. Oregon's school-closure orders (EO 20-08, EO 20-20, EO 20-29) required schools to close or limit in-person instruction, which directly and foreseeably caused Plaintiff's

Page 24 -    COMPLAINT

employees with school-age children to be unavailable for work. These staffing losses were the intended and foreseeable consequences of orders that expressly mandated work exclusion and school closures—not the product of general pandemic anxiety or voluntary employee decisions. Plaintiff experienced 74 days of unanticipated lost work in Q2 2020, 266 days in Q3 2020, 137 days in Q4 2020, and 82 days in Q3 2021 as a direct result of these mandates.

f.    *Testing and Monitoring Burdens.* OR DHS's Administrative Orders (APD 29-2020, APD 34-2020, APD 45-2020, APD 54-2020) and CMS's QSO-20-38-NH expressly required Plaintiff to conduct COVID-19 testing of all staff and residents one to two times per week (up to 77 staff members and approximately 40 residents), complete and submit contact-tracing forms to OHA weekly, and implement quarantine and isolation protocols. These testing and monitoring activities directly displaced time that Plaintiff's staff would otherwise have spent on patient care and ordinary facility operations. The diversion of staff time was the direct and foreseeable consequence of orders that expressly commanded the testing activity, and not an attenuated or second-order effect.

g.    *Restricted Movement Within Facility.* Government Orders requiring cohorting, room restriction, transmission-based precautions, and six-foot physical distancing expressly limited how Plaintiff's employees could move within the facility and interact with residents. These movement restrictions increased the time required to complete routine tasks and reduced operational efficiency. The movement restrictions were the direct and foreseeable consequence of orders that mandated specific spatial separation between individuals.

98.

None of the partial suspensions identified above resulted from general pandemic conditions, voluntary business decisions, economic uncertainty, or public fear of the virus. Each resulted directly from the mandatory commands of specific, enforceable government orders that carried penalties for noncompliance, including fines, imprisonment, license conditions, facility closure, and CMS enforcement actions.

Page 25 -    COMPLAINT

99.

The Government Orders remained in effect during each of the quarters at issue. Unlike a business that was never subject to operational restrictions or whose restrictions were lifted before the relevant tax period, Plaintiff was subject to active, enforceable, mandatory orders throughout Q2 2020, Q3 2020, Q4 2020, and Q3 2021 that directly caused the identified suspensions of its operations during those same periods.

100.

Plaintiff's Medicare Part A revenue declined approximately 13% from Q2 2019 to Q2 2020, approximately 31% from Q3 2019 to Q3 2020, and approximately 37% from Q4 2019 to Q4 2020, corroborating the operational impact of the government orders that directly restricted Plaintiff's admission of Medicare patients.

101.

OHA Weekly Outbreak COVID-19 Report data show that Plaintiff experienced COVID-19 outbreaks in its assisted living facility during August 2020 and December 2020. These outbreaks triggered additional, facility-specific OR DHS restrictions, including further restricting all internal group activities, requiring consultation with local public health, and in some circumstances requiring closure of the facility to new admissions, that directly and foreseeably caused further suspensions of Plaintiff's operations.

**D.    Quarter-Specific Impacts**

102.

By way of example, Government Orders impacted Plaintiff's business operations during the specific quarters at issue in the following ways:

_Second Quarter of 2020 (April 1 – June 30, 2020)_

103.

During Q2 2020, OR DHS's Executive Letter (NF-20-67, as updated March 18, 2020) and the COVID-19 Implementation Guide (NF-20-70) required Plaintiff to restrict visitation to

Page 26 -    COMPLAINT

essential visitors only, screen 100% of individuals entering the facility each time they entered, document all screenings on a form and maintain logs available for regulatory inspection, discontinue community outings, cancel congregate activities, and implement "virtual visit" alternatives using technology such as FaceTime and Skype. But for Government Orders, Plaintiff would have continued providing unrestricted visitation, communal activities, and community outings.

104.

Executive Order No. 20-10 (March 19, 2020) required postponement of elective and non-urgent procedures in all healthcare settings utilizing PPE through at least June 15, 2020. As a direct result of this order, Plaintiff experienced reduced admissions of Medicare patients to its skilled nursing facility for rehabilitation purposes during the second quarter of 2020. But for EO 20-10, hospitals would have continued performing elective procedures and transferring rehabilitation patients to Plaintiff.

105.

Executive Order No. 20-12 (March 23, 2020, through May 14, 2020) required Plaintiff's management and ownership to devote hours of education and research to determine the course of Plaintiff's operations while the stay-home order was in effect, to familiarize themselves with CMS telehealth guidelines, and to draft and implement Plaintiff's telehealth policies and procedures. These administrative requirements directly displaced management time from ordinary business operations.

106.

Due to school closures ordered by Executive Order No. 20-08 (March 17, 2020) and extended through the end of the 2019–2020 school year by Executive Order No. 20-20, Plaintiff was required to change its schedule weekly for employees with young children who could not attend school. These staffing disruptions were the direct and foreseeable consequence of government-mandated school closures, not of voluntary employee choices.

Page 27 -    COMPLAINT

107.

OHA's Provisional Guidance (March 9, 2020) and updated Guidance 2288J (March 27, 2020) required Plaintiff to exclude sick or exposed healthcare personnel from the workplace, manage PPE supplies and usage, bundle patient care to increase efficiency and reduce exposure time, implement universal masking by patients, visitors, and healthcare personnel, and implement universal eye protection for healthcare personnel. These requirements changed Plaintiff's pre-pandemic care delivery model in which most procedures did not require masks and few required PPE beyond gloves.

108.

Malheur County, where Plaintiff operated, was approved for Phase 1 reopening on approximately May 20, 2020, and remained in Phase 1 through approximately June 6, 2020. Under Phase 1, restrictions on non-essential visitors at long-term care facilities remained in place, and Plaintiff was required to continue to screen for symptoms, require PPE, hand-washing protocols, and social distancing for all essential visitors.

109.

CMS's QSO-20-14-NH (effective March 13, 2020), which OR DHS required Plaintiff to implement, mandated that Plaintiff cancel communal dining and all group activities – both internal and external – implement active screening of residents and staff for fever and respiratory symptoms at the beginning of each shift, and restrict visitation of all visitors and non-essential healthcare personnel except for compassionate-care situations. These requirements constituted direct commands to cease identifiable portions of Plaintiff's operations that would not have been ceased absent the orders.

110.

During Q2 2020, Plaintiff experienced 74 days of unanticipated lost work due to COVID-19 mandates requiring exclusion of sick or exposed staff from the workplace, the mandatory school

Page 28 -    COMPLAINT

closures that left employees without childcare, and other order-mandated disruptions to normal staffing patterns.

111.

Plaintiff's Medicare Part A revenue declined approximately 13% from Q2 2019 to Q2 2020, and Medicare Part B revenue declined approximately 56% during the same period, corroborating the operational impact of government orders that directly restricted admissions and elective procedures.

*Third Quarter of 2020 (July 1 – September 30, 2020)*

112.

During Q3 2020, Malheur County moved from Phase 2 (approximately June 6 through August 6, 2020) back to Phase 1 (approximately August 13 through at least November 11, 2020) as infection and transmission rates increased, resulting in a regression to more restrictive requirements for Plaintiff's operations. This regression was the direct result of government-imposed risk-level metrics, not a voluntary business decision by Plaintiff.

113.

Beginning July 15, 2020, OR DHS's Temporary Administrative Order APD 29-2020 imposed COVID-19 testing requirements on Plaintiff, requiring initial testing of all residents, facility staff, and associated staff; quarantine measures for newly admitted or readmitted residents for 14 days; and risk-based COVID-19 screening of all residents prior to admission or readmission. These testing and quarantine activities directly displaced staff time that would otherwise have been spent on patient care and ordinary facility operations.

114.

On June 12, 2020, OHA issued the Long Term Care Facility Testing Plan, requiring facilities to complete baseline testing of staff and residents by September 30, 2020, and to develop and implement a plan for ongoing monitoring including mandatory testing of all staff every 7 days

Page 29 -    COMPLAINT

HOLLAND & KNIGHT LLP
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone:  503.243.2300

so that 100% were tested every month. Plaintiff was required to order tests, report results, and implement this comprehensive testing regime throughout Q3 2020.

115.

On July 13, 2020, OR DHS issued NF-20-98, Limited Outdoor Visitation, which permitted only limited, structured outdoor visits subject to screening, physical distancing, six-foot separation with marked seating, visitor logs for contact tracing, staff monitoring of visits, and facility cleaning and disinfection between visitor sessions. Indoor visitation remained prohibited during this quarter except for compassionate-care situations. But for these orders, Plaintiff would have provided unrestricted in-person visitation.

116.

Executive Order No. 20-22 (April 27, 2020) continued to limit the resumption of elective and non-urgent procedures to only those procedures that complied with OHA guidance. OHA's Guidance 2322U on Resumption of Non-Emergent and Elective Procedures required hospitals to "consider ongoing postponement of non-emergent and elective procedures that are expected to require . . . [t]ransfer to skilled nursing facility or inpatient rehabilitation." This directly and foreseeably continued to reduce Plaintiff's admissions of Medicare patients for rehabilitation during Q3 2020.

117.

On August 26, 2020, CMS issued QSO-20-38-NH, requiring Plaintiff to test all staff and residents, restrict symptomatic staff from the facility pending test results, place symptomatic residents on transmission-based precautions, and, upon identification of a single new COVID-19 case, retest all staff and residents every 3 to 7 days until no new cases were identified for at least 14 days. These testing mandates imposed substantial, recurring operational burdens directly caused by the order's express commands.

Page 30 -    COMPLAINT

118.

OHA Weekly Outbreak COVID-19 Report data show that Plaintiff experienced a COVID-19 outbreak in its assisted living facility during August 2020, which resulted in at least two resident deaths. This outbreak triggered additional OR DHS facility-specific restrictions on admissions, visitation, and infection control, including further restricting all internal group activities and requiring consultation with local public health. These additional restrictions were the direct and foreseeable consequence of the existing regulatory framework governing facilities with confirmed COVID-19 cases.

119.

During Q3 2020, Plaintiff experienced 266 days of unanticipated lost work due to COVID-19 mandates, which was more than three times the lost work experienced in the prior quarter. This dramatic increase reflected the compounding effect of the Government Orders mandating testing, work-exclusion, and quarantining in Q3 2020.

120.

Plaintiff's Medicare Part A revenue declined approximately 31% from Q3 2019 to Q3 2020, and Medicare Part B revenue declined approximately 13% during the same period, corroborating the continuing and increasing operational impact of government orders that directly restricted Plaintiff's admissions and operations.

*Fourth Quarter of 2020 (October 1 – December 31, 2020)*

121.

During Q4 2020, Malheur County was classified at the Extreme Risk Level from at least November 15 through December 31, 2020, subjecting Plaintiff to the most restrictive tier of Oregon's risk-level framework.

122.

On November 2, 2020, OR DHS issued NF-20-140, Limited COVID-19 Indoor Visitation Policy, which permitted limited indoor visitation only if there had been no new onset of COVID-

Page 31 -     COMPLAINT

19 cases in the last 14 days, the facility was not conducting outbreak testing, and the facility was not under an OR DHS Executive Order. Facilities were required to limit visitors to two per resident at any given time and limit the total number of residents with visitors to 5 residents or 20% of residents, whichever was less.

123.

On November 15, 2020, OR DHS issued NF-20-149, prohibiting all indoor visitation for long-term care facilities statewide effective November 18, 2020, in accordance with the governor's Two-Week Freeze (EO 20-65). This prohibition remained in effect through at least January 29, 2021, eliminating all indoor visitation at Plaintiff for the remainder of the fourth quarter. The total cessation of indoor visitation was the direct and intended consequence of an express governmental prohibition.

124.

Oregon OSHA's Temporary Administrative Order OSHA 3-2020 (effective November 16, 2020) imposed specific workplace safety requirements, including mandatory six-foot physical distancing, universal masking, regular cleaning and sanitization of common areas, and additional requirements for "workplaces at exceptional risk" including healthcare settings such as Plaintiff's, which included measures to protect employees from infected individuals, use of airborne infection isolation rooms, isolation of suspected patients, and use of physical barriers. Plaintiff was required to redesign its workflow to comply with these requirements.

125.

On December 1, 2020, OHA and DHS issued guidance 3464, Best Practices for Hospitals and Long-term Care Facilities for COVID-19 related New/Readmissions, providing that OR DHS would not approve transfer of COVID-19 patients requiring transmission-based precautions to COVID-negative LTCFs. This directly restricted admissions and transfers to Plaintiff.

Page 32 -    COMPLAINT

126.

OHA Weekly Outbreak COVID-19 Report data identified another COVID-19 outbreak at Plaintiff's assisted living facility during December 2020. This additional outbreak triggered further OR DHS facility-specific restrictions on admissions, visitation, and infection control under the existing regulatory framework, including closure of the facility to new admissions when COVID-19 was confirmed in two or more individuals. These facility-specific restrictions were the direct and foreseeable consequence of the regulatory framework governing LTCF outbreaks.

127.

During Q4 2020, Plaintiff experienced 137 days of unanticipated lost work due to COVID-19 mandates.

128.

Plaintiff's Medicare Part A revenue declined approximately 37% from Q4 2019 to Q4 2020, and Medicare Part B revenue declined approximately 77% over the same period, corroborating the impact of fourth-quarter restrictions on Plaintiff's operations, including the Extreme Risk Level designation, the statewide indoor visitation ban, the OHA/DHS admission-transfer prohibition, and the December outbreak restrictions.

*Third Quarter of 2021 (July 1 – September 30, 2021)*

129.

During the third quarter of 2021, Executive Order No. 20-66 and its implementing guidance continued to apply to Plaintiff's operations, requiring compliance with OHA guidance and subjecting non-compliant businesses to closure, resulting in Plaintiff remaining subject to active, enforceable government orders throughout Q3 2021.

130.

Oregon OSHA's Temporary Administrative Order OSHA 5-2021 (effective June 30, 2021) continued to impose COVID-19 workplace requirements on Plaintiff during the third quarter of 2021, including mandatory cleaning and sanitization of common areas, shared equipment, and

Page 33 -    COMPLAINT

high-touch surfaces at least once every 24 hours, and requiring employees recommended for quarantine or isolation by OHA or a medical provider to isolate at home. In August 2021, Oregon OSHA reimplemented employee masking requirements in all workplaces. On September 16, 2021, Oregon OSHA issued OSHA 12-2021, continuing physical distancing requirements of six feet, cleaning and sanitization requirements, healthcare-specific sanitation measures, employee quarantine and isolation provisions, and screening and triage requirements through at least September 30, 2021.

131.

On August 5, 2021, OHA issued Temporary Administrative Order PH 34-2021, "Vaccination and Testing Requirements to Control COVID-19 for Healthcare Providers and Healthcare Staff," which applied to Plaintiff and required healthcare providers and staff in nursing and assisted living facilities to be fully vaccinated or undergo weekly COVID-19 testing. This order required Plaintiff to have policies for requesting proof of vaccination and testing providers and staff for COVID-19 on a weekly basis. These vaccination and testing mandates were express governmental commands that directly required Plaintiff to divert staff time and resources, not voluntary business decisions.

132.

CMS's QSO-21-19-NH (effective May 11, 2021) required Plaintiff to develop and implement policies and procedures to offer COVID-19 vaccination to all residents and staff, administer vaccines in accordance with CDC, ACIP, FDA, and manufacturer guidelines, and adhere to then current infection-prevention and control recommendations during vaccine preparation and administration.

133.

OR DHS's Permanent Administrative Order APD 54-2020 continued in effect during the third quarter of 2021, requiring Plaintiff to implement 14-day quarantine measures for newly admitted or readmitted residents, conduct risk-based COVID-19 screenings of all residents before

Page 34 -    COMPLAINT

admission or readmission, prohibit admission of residents presenting COVID symptoms without prior testing, obtain written approval from OR DHS before admitting residents known to have COVID-19, and follow OHA COVID-19 clinical guidelines. These permanent restrictions constituted active, enforceable mandates throughout Q3 2021 that directly curtailed admissions into Plaintiff's facilities.

134.

CMS's QSO-20-14-NH, QSO-20-38-NH, and QSO-20-39-NH remained in effect through May 11, 2023, and continued to impose visitation restrictions, testing requirements, infection-prevention protocols, and communal-activity limitations on Plaintiff throughout Q3 2021.

135.

During Q3 2021, Plaintiff was listed on Oregon's long-term care facility COVID-19 website for both its assisted living facility (June 25, 2021) and nursing facility (August 27, 2021), indicating continued COVID-19 activity and associated operational restrictions at the facility.

136.

During Q3 2021, Plaintiff had an outbreak of COVID-19 amongst the staff, which, under relevant government orders, required quarantining such staff members who were thus unable to report to work.

137.

During Q3 2021, Plaintiff experienced 82 days of unanticipated lost work due to COVID-19 mandates requiring exclusion of sick or exposed staff and quarantine of exposed employees, and such losses were directly caused by the express work-exclusion commands in OHA 2288J, Oregon OSHA 5-2021, and CMS QSO-20-14-NH, rather than by voluntary employee absences, general pandemic anxiety, or any other reason.

///

///

///

Page 35 -     COMPLAINT

**HOLLAND & KNIGHT LLP**
601 SW 2nd Ave., Ste. 1800
Portland, OR 97204
Telephone:  503.243.2300

138.

During Q3 2021, due to legal minimum staffing requirements for Plaintiff's operations and Plaintiff's staffing shortages, Plaintiff could not accept potential patients, which caused a significant increase in empty beds at Plaintiff's facilities.

139.

Thus, in Q3 2019 an average of 12.66 of Plaintiff's 33 beds were empty, whereas in Q3 2021 an average of 18.33 of its 33 beds were empty, representing a 45% increase in average empty beds. Regarding skilled nursing beds, in Q3 2019 an average of 9 of Plaintiff's 18 beds were empty, whereas in Q3 2021 an average of 13.66 of its 18 beds were empty.

140.

Plaintiff's revenue declined approximately 19% from Q3 2019 to Q3 2021, and its Medicare revenue declined approximately 62% from Q3 2019 to Q3 2021, corroborating the impact of government order restrictions on Plaintiff's operations in Q3 2021.

141.

As a result of the conditions described above, Plaintiff's business operations were fully or partially suspended due to orders from governmental authorities during each of the quarters at issue. The identified suspensions were not the product of general pandemic conditions, voluntary business decisions, economic uncertainty, or public fear of the virus; each resulted directly from the mandatory commands of specific, enforceable government orders that remained in effect during the relevant quarters and that carried penalties for noncompliance, including fines, imprisonment, license conditions, facility closure, and CMS enforcement actions.

**COUNT ONE: QUARTER TWO OF 2020**

142.

Plaintiff incorporates by reference paragraphs 1 through 141.

Page 36 -    COMPLAINT

143.

On or about April 11, 2025, Plaintiff filed a Form 843, Claim for Refund and Request for Abatement, with the IRS for Q2 2020 making a payment in the amount of $494.77 representing a divisible portion of the assessed employment tax liability for that quarter and immediately requesting a refund.

144.

On or about July 15, 2025, Plaintiff filed a Form 843 seeking recovery of $241,440.28 that the IRS had applied from Plaintiff's Q2 2021 ERC refund as a payment towards the Q2 2020 assessed employment tax liability.

145.

Plaintiff paid wages and compensation to its employees during Q2 2020.

146.

Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during the second quarter of 2020, within the meaning of the CARES Act.

147.

Based on the foregoing, Plaintiff is entitled to a refund of $208,579.54 for Q2 2020.

**COUNT TWO: QUARTER THREE OF 2020**

148.

Plaintiff incorporates by reference paragraphs 1 through 147.

149.

On or about April 11, 2025, Plaintiff filed a Form 843, Claim for Refund and Request for Abatement, with the IRS for Q3 2020 making a payment in the amount of $1,023.49 representing a divisible portion of the assessed employment tax liability for that quarter and immediately requesting a refund.

Page 37 -    COMPLAINT

150.

On or about July 15, 2025, Plaintiff filed a Form 843 seeking recovery of $20,054.48 that the IRS had applied from Plaintiff's Q2 2021 ERC refund as a payment towards Q3 2020 assessed employment tax liability.

151.

Plaintiff paid wages and compensation to its employees during Q3 2020.

152.

Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during Q3 2020, within the meaning of the CARES Act.

153.

Based on the foregoing, Plaintiff is entitled to a refund of $55,252.75 for Q3 2020.

**COUNT THREE: QUARTER FOUR OF 2020**

154.

Plaintiff incorporates by reference paragraphs 1 through 153.

155.

On or about April 11, 2025, Plaintiff filed a Form 843, Claim for Refund and Request for Abatement, with the IRS for Q4 2020 making a payment in the amount of $3,481.74 representing a divisible portion of the assessed employment tax liability for that quarter and immediately requesting a refund.

156.

Plaintiff paid wages and compensation to its employees during the Q4 2020.

157.

Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during Q4 2020, within the meaning of the CARES Act.

158.

Based on the foregoing, Plaintiff is entitled to a refund of $3,481.74 for Q4 2020.

Page 38 -     COMPLAINT

## COUNT FOUR: QUARTER THREE OF 2021

159.

Plaintiff incorporates by reference paragraphs 1 through 158.

160.

On or about March 27, 2023, Plaintiff timely filed a Form 941-X, Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund, claiming the ERC for Q3 2021.

161.

The Q3 2021 Form 941-X reported that Plaintiff's nonrefundable portion of the ERC was $8,665.47.

162.

The Q3 2021 Form 941-X reported that Plaintiff's refundable portion of the ERC was $259,758.04.

163.

Plaintiff paid wages and compensation to its employees during Q3 2021.

164.

On or about August 16, 2024, the IRS issued Letter 105C disallowing Plaintiff's ERC claim for the third quarter of 2021.

165.

Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during Q3 2021, within the meaning of I.R.C. § 3134.

166.

Based on the foregoing, Plaintiff is entitled to a refund of $268,423.51 for Q3 2021.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all the issues so triable.

Page 39 -    COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court grant judgment in its favor against the Defendant for:

a.        A refund in the amount of at least $491,799.00 or such other amount as the Court determines to be refundable, plus statutory interest on that amount as provided by law;

b.        Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law; and

c.        All further relief the Court deems appropriate.

Dated this 6th day of August, 2026.

HOLLAND & KNIGHT LLP

By: *s/Shannon Armstrong*
Shannon Armstrong,  OSB No. 060113
shannon.armstrong@hklaw.com
601 SW Second Avenue, Suite 1800
Portland, OR 97204
Telephone: 503.243.2300
Fax: 503.241.8014

Brock E. Whalen (pro hac vice forthcoming)
brock.whalen@hklaw.com
98 San Jacinto Blvd., Suite 1900
Austin, TX 78701
Telephone: 512.647.4387

Samantha Skabelund (pro hac vice forthcoming)
samantha.skabelund@hklaw.com
800 17th Street N.W., Suite 1100
Washington, DC 20006
Telephone: 202.469.5649

Emily Earnshaw (pro hac vice forthcoming)
emily.earnshaw@hklaw.com
1722 Routh St. 1500
Dallas, Texas 75201
Telephone: 214.969.2549

*Attorneys for Plaintiff*